O

| | |
|---|---|
| RCR PLUMBING AND MECHANICAL, INC. FKA AMPAM RCR COMPANIES, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| ACE AMERICAN INSURANCE COMPANY, AND ESIS, INC., | ) ) ) |
| Defendants. | ) |

Case No. EDCV 10-00995 VAP(DTBx)

**AMENDED ORDER (1) DENYING DEFENDANTS' MOTION TO DISMISS RE: INSUFFICIENT SERVICE; (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS RE: FAILURE TO ARBITRATE; AND (3) STAYING ACTION**

**[Motions filed on March 24 and March 25, 2011]**

Defendants ACE American Insurance Company ("ACE") and ESIS, Incorporated ("ESIS") (collectively, "Defendants") filed a motion to dismiss for insufficient service ("Motion re: Insufficient Service") and a motion to dismiss for failure to arbitrate, or in the alternative, stay the action ("Motion re: Failure to Arbitrate"). (Doc. Nos. 15, 17.) Plaintiff RCR Plumbing and Mechanical, Incorporated ("Plaintiff") opposes both motions. (Doc. Nos. 23, 24.) The parties came before

the Court for a hearing on April 29, 2011.  Having
considered the arguments put forth in support of, and
against, the Motions, the Court DENIES the Motion re:
Insufficient Service, DENIES in part and GRANTS in part
the Motion re: Failure to Arbitrate, and STAYS the
action.

# I. BACKGROUND

## A.   Factual Background

The following claims arise out of a series of
commercial general liability policies (the "Policies")
and implementing documents held by Plaintiff with
Defendants between November 1, 2003, and November 1,
2007.  (First Amended Complaint ("FAC") ¶¶ 8-12.)

### 1.   Plaintiff's Factual Allegations

On August 2, 2004, a Bankruptcy Court entered an
order (the "Bankruptcy Order") with respect to
Plaintiff's predecessor, AMPAM RCR Companies ("AMPAM"),
discharging AMPAM's obligations in bankruptcy, including
certain obligations arising out of construction defect
lawsuits and deductible obligations under the Policies.
(FAC ¶ 13.)  The discharge included all occurrences
giving rise to property damage for work completed by
Plaintiff on or before August 2, 2004.  (<u>Id.</u> ¶ 14.)

Despite the prohibition in the Bankruptcy Order, ACE continued to accept tenders and pay claims from additional insureds on claims that had been discharged. (FAC ¶¶ 15-16, 18.) Plaintiff petitioned the Bankruptcy Court to clarify the Bankruptcy Order, and on July 11, 2008, the Bankruptcy Court issued another order (the "Enforcement Order") finding ACE should not have accepted the pre-2004 claims. (Id. ¶ 21.) Plaintiff expended over $500,000.00 seeking legal counsel and obtaining the Enforcement Order. (Id. ¶ 24.)

As a condition of issuing the Policies, ACE demanded Plaintiff commit to a collateral obligation agreement, with ACE as a beneficiary. (FAC ¶ 36.) Defendants set the amount of the collateral obligation "grossly in excess of that reasonably required" – the current amount is over $5.4 million – and has repeatedly refused Plaintiff's requests to reduce the amount. (Id. ¶¶ 38-39.) ACE's action in requiring Plaintiff to commit to the collateral obligation agreement was part of a scheme to secure payment on the Policies' high deductibles. (Id. ¶ 40.)

Upon tender of a claim to them, Defendants should have investigated what portion of the defense of a claim was not covered under the Policies in order to minimize Plaintiff's share of the loss. (Id. ¶¶ 50-54.)

Defendants failed to do so, and further did not pursue contribution or subrogation from other liable carriers, nor did they provide Plaintiff with sufficient information to seek recourse against additional insured carriers itself.  (Id. ¶¶ 55-58.)

ACE also charged Plaintiff the full deductible for a number of state court actions where ACE was not responsible for full coverage of Plaintiff, and where imposition of the deductible violated California law. (FAC ¶¶ 59-64.)  ACE has also imposed a deductible on Plaintiff in other declaratory relief actions where the deductible provisions were not triggered.  (Id. ¶ 68.)

Finally, starting in 2006, and most recently in 2009, Plaintiff agreed orally with Defendants that Plaintiff would conduct its own "claims handling, investigation, expense, defense and indemnity claims" within the deductible under the Policies.  (FAC ¶ 69.)  Between 2006 and 2008, "ACE's course of conduct has been inconsistent with the mutual understanding of the parties that Plaintiff was to handle its own defense of general liability claims" within the deductible.  (Id. ¶ 73.)

**2.   The Program Agreements**

In conjunction with the Policies, AMPAM and Plaintiff entered into a series of program agreements (the "Program

Agreements") with ACE to confirm some details of the insurance program, including Plaintiff's agreement to maintain a collateral obligation to cover its deductibles.  (<u>See</u> Mot. re: Failure to Arbitrate, Gordon Decl., Ex. A.[1])  The Program Agreements contain an arbitration clause which states:

> Any controversy, dispute, claim or question arising out of or relating to this Agreement, including without limitation its interpretation, performance, or non-performance by any party, or any breach thereof (hereinafter, collectively, Controversy) shall be referred to, and resolved exclusively by three arbitrators though private, confidential arbitration conducted in Philadelphia, PA.

(<u>Id.</u> at 8.)[2]

### 3.    The Risk Management Services Agreements

Plaintiff also entered into a series of risk management services agreements (the "RMSAs") with ESIS explaining the services, terms, and conditions of ESIS's work.  (<u>See</u> Mot. re: Failure to Arbitrate, Gordon Decl.,

---

[1] Defendants attach a copy of one of the Program Agreements as Exhibit A to the Gordon Declaration for the Motion re: Failure to Arbitrate.  Plaintiff makes no objection to this document's authenticity or accuracy.

[2] Plaintiff and ACE also entered into a series of collateral agreements (the "Collateral Agreements") establishing the exact terms of Plaintiff's collateral obligation.  (<u>See</u> Mot. re: Failure to Arbitrate, Gordon Decl., Ex. B.)  The Collateral Agreements contain an arbitration provision identical to the one contained in the Program Agreements.  (<u>See</u> <u>id.</u> at 6-7.)  Because the terms of the collateral obligation and more are included in the Program Agreements, the parties and the Court focus here on the Program Agreements rather than the Collateral Agreements.

1  Ex. C.[3])  The RMSAs contain an arbitration clause which
2  states that "[i]n the event that a dispute arises
3  concerning the meaning, interpretation or performance of
4  this Agreement, such dispute shall be resolved
5  consensually if possible and, if not possible, by binding
6  arbitration of the dispute[.]"  (Id. at 6.)  The RMSAs go
7  on to state that, "[n]otwithstanding this provision, it
8  is not the parties' intention to resolve by arbitration
9  the rights and obligations of the parties or any other
10 person pursuant to any policy of insurance, either
11 directly or indirectly."  (Id. at 7.)

12

13 **B.  Procedural History**

14     On July 7, 2010, Plaintiff filed an initial complaint
15 ("Complaint") against Defendants.  (Doc. No. 1.)  On
16 November 17, 2010, Plaintiff filed a motion to extend the
17 time period for service of the Complaint.  (Doc. No. 5.)
18 The Court granted Plaintiff's motion and gave Plaintiff
19 until March 4, 2011, to serve Defendants.  (Doc. No. 6.)

20

21     On March 3, 2011, Plaintiff filed a First Amended
22 Complaint ("FAC"), alleging breach of written contract,
23 breach of oral contract, and breach of the implied
24 covenant of good faith and fair dealing, and seeking
25 declaratory relief.  (Doc. No. 11.)  As explained in

26

27 _____

       [3] Plaintiff does not object to the authenticity or
28 accuracy of this document either.

6

greater detail above, Plaintiff asserts it suffered damages as a result of Defendants' violation of the Policies, the Bankruptcy Order, and the Enforcement Order. (FAC ¶¶ 75-95.) Plaintiff also asserts it suffered damages as a result of Defendants breach of the oral agreement that Plaintiff would control its own defense of claims with the deductible under the Policies. (Id. ¶¶ 96-107.) Finally, Plaintiff asserts it suffered damages caused by ACE's breach of the implied covenant of good faith and fair dealing in the Policies as described above. (Id. ¶¶ 108-120.) Plaintiff seeks a series of declaratory judgments based upon its claims. (Id. at 28-30.)

Defendants filed the Motion re: Insufficient Service on March 24, 2011. (Doc. No. 15.) In support of this motion, Defendants filed: (1) a declaration from Nancy Flores ("N. Flores Decl."), the corporate operations manger at CT Corporation ("CT"), Defendants' authorized agent for service of process; and (2) a declaration from Defendant's counsel Andrew Gordon ("Gordon Decl."). (Doc. Nos. 15-1, 15-7.) Submitted with the N. Flores Declaration are a number of logs from CT regarding Plaintiff's service of process on Defendants. (N. Flores Decl., Exs. A-E.)

Plaintiff filed an opposition to the Motion re: Insufficient Service ("Opp'n to Mot. re: Insufficient Service") on April 4, 2011. (Doc. No. 23.) In support of this Opposition, Plaintiff filed: (1) a declaration from Plaintiff's counsel Matthew L. Cookson ("Cookson Decl."); (2) a declaration from process server Henry Flores ("H. Flores Decl."); and (3) a declaration from Plaintiff's personal insurance broker Senior Vice President Mark Pastorius ("Pastorius Decl."). (Doc. Nos. 23-1—23-3.) Submitted with the H. Flores Declaration are copies of the proofs of service upon ACE and ESIS (H. Flores Decl., Exs. A, B), electronic mail messages ("emails") between counsel for the parties (id., Exs. C, F, H-K), pleadings or orders from this action (id., Exs. D, E, G), and printouts from the California Secretary of State website of the business entity details for ACE and ESIS (id., Exs. L, M).

Defendants filed a reply in support of the Motion re: Insufficient Service ("Reply for Mot. re: Insufficient Service") on April 11, 2011. (Doc. No. 26.) In support of this Reply, Defendants filed another declaration from Nancy Flores ("N. Flores Decl.") attaching documents from CT, and a declaration from CT process specialist Margaret Wilson ("Wilson Decl."). (Doc. Nos. 26-1, 26-2.)

Defendants filed the Motion re: Failure to Arbitrate on March 25, 2011. (Doc. No. 17.) In support of this motion, Defendants filed a declaration from Defendants' counsel Andrew Gordon ("Gordon Decl.") and a number of supporting exhibits. (Doc. No. 17-1.) The exhibits are: (1) a copy of one of the Program Agreements (Gordon Decl., Ex. A); (2) a copy of one of the Collateral Agreements (id., Ex. B); (3) a copy of one of the RMSAs (id., Ex. C); (4) a copy of the assumption of insurance obligations between Plaintiff, AMPAM, and ACE (id., Ex. D); a demand for arbitration ("Arbitration Demand") by Defendants on Plaintiff, dated March 21, 2011 (id., Ex. H), as well as a number of documents from the AMPAM's bankruptcy proceedings, emails between counsel for the parties, and a copy of the deductible provision from the Policies (id., Exs. E-G, I). (Doc. Nos. 17-2—17-10.)

Plaintiff filed an Opposition to the Motion re: Failure to Arbitrate on April 4, 2011, along with (1) a declaration from Plaintiff's counsel Matthew Cookson ("Cookson Decl.") attaching a copy of the FAC and (2) a declaration from Plaintiff's Director of Risk Management Wendy McBride ("McBride Decl."). (Doc. Nos. 24-24-2.) Defendants filed a reply in support of the Motion re: Failure to Arbitrate ("Reply for Mot. re: Failure to Arbitrate") on April 11, 2011. (Doc. No. 25.)

# II. LEGAL STANDARDS

## A.  Service of Process

"A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Fed. R. Civ. P. 4."  <u>Travelers Cas. and Sur. Co. of America v. Brenneke</u>, 551 F.3d 1132, 1135 (9th Cir. 2009) (citing <u>Benny v. Pipes</u>, 799 F.2d 489, 492 (9th Cir. 1986)).  Under Federal Rules of Civil Procedure ("Rules") 12(b)(4) and 12(b)(5), a party may bring a motion to dismiss for insufficiency of process and of service of process.  Where a Rule 12 motion contests the validity of service, the burden is on plaintiff to establish the validity of service.  <u>See</u> <u>Norlock v. City of Garland</u>, 768 F.2d 654, 656 (5th Cir. 1985).

Rule 4(h) provides that a party may serve a corporation by:

> delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant[.]

Fed. R. Civ. P. 4(h)(1)(B).[4]

---

[4] The Court also looks to California's law regarding service of process, as Rule 4(e)(1) permits service pursuant to the law of the state "where the district court is located or where service is made."  For the purposes of this action, the requirements of the California Code of Civil Procedure are the same as those

(continued...)

## B.    Failure to Arbitrate

Under the Federal Arbitration Act ("FAA"):

> If any suit or proceeding be brought in any
> of the courts of the United States upon any
> issue referable to arbitration under an
> agreement in writing for such arbitration,
> the court in which such suit is pending, upon
> being satisfied that the issue involved in
> such suit or proceeding is referable to
> arbitration under such an agreement, shall on
> application of one of the parties stay the
> trial of the action until such arbitration
> has been had in accordance with the terms of
> the agreement, providing the applicant for
> the stay is not in default in proceeding with
> such arbitration.

9 U.S.C. § 3 (2006).

Under the FAA, the role of the district court is to determine (1) whether a valid, enforceable arbitration agreement exists and (2) whether the claims asserted in the complaint are within the scope of the arbitration agreement.  See 9 U.S.C. § 3; Chiron Corp. v. Ortho Diagnostic Systems, Inc., 207 F.3d 1126, 1130 (9th Cir. 2000); Howard Elec. & Mech. Co., Inc. v. Frank Briscoe Co., Inc., 754 F.2d 847, 849 (9th Cir. 1985).

The FAA requires that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable,

_____

[4](...continued)
under the federal rules.  See Cal. Civ. Proc. Code §§ 415.15-.95 (2011).

11

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. __, 130 S. Ct. 2772, 2776 (2010) (quoting 9 U.S.C. § 2).  Commerce is defined as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation . . . ."  9 U.S.C. § 1.

Through the FAA, Congress created a liberal federal policy favoring arbitration agreements.  Perry v. Thomas, 482 U.S. 483, 489 (1987) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . . ."  Moses H. Cone, 460 U.S. at 24–25.  "The standard for demonstrating arbitrability is not high. . . .  Such [arbitration] agreements are to be rigorously enforced."  Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir. 1999).

The FAA's enactment "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered."  Volt Info. Sci., Inc.

v. Bd. of Tr. of Leland Stanford Junior Univ., 489 U.S.
468, 478 (1989).  "[T]he FAA does not require parties to
arbitrate when they have not agreed to do so . . . .  It
simply requires courts to enforce privately negotiated
agreements to arbitrate, like other contracts, in
accordance with their terms."  Id.

## III. DISCUSSION

**A.   Insufficient Service**

     Defendants argue that the action should be dismissed
because Plaintiff did not serve ESIS with any summons,
and served ACE with a summons that contained errors.
(Mot. re: Insufficient Service at 3-4.)  According to
Plaintiff, both ACE and ESIS were properly served with
the FAC and a summons on March 4, 2011.  (Opp'n to Mot.
re: Insufficient Service at 4.)

     Defendants state that Plaintiff first served CT with
only the FAC on March 3, 2011.  (Mot. re: Insufficient
Service at 5.)  Defendants argue that Plaintiff then
served only ACE with an additional copy of the FAC and
the summons on March 4, 2011, and the summons was invalid
because it was the summons for the original Complaint.
(Id.)  Plaintiff asserts that process server Flores
served both ACE and ESIS with a summons and the FAC on

March 4, 2011, at 2:50 p.m.[5]  (Opp'n to Mot. re:

Insufficient Service at 4; H. Flores Decl. ¶¶ 13-14.)

Where a defendant challenges the validity of service,
the plaintiff bears the burden of establishing that
service was valid.  <u>See</u> <u>Brockmeyer v. May</u>, 383 F.3d 798,
801 (9th Cir. 2004); <u>see also</u> William W. Schwarzer, et
al., <u>Federal Civil Procedure Before Trial</u> § 9:148 (2010)
("Where the validity of service is contested by Rule 12
motion, the burden is on plaintiff (the party claiming
proper service has been effected) to establish the
validity of service.").  A plaintiff may submit a signed
proof of service, which "constitutes prima facie evidence
of valid service which can be overcome only by strong and
convincing evidence." <u>S.E.C. v. Internet Solutions for
Bus. Inc.</u>, 509 F.3d 1161, 1163 (9th Cir. 2007).  Unless a
defect in service is shown on the face of the return, a
motion to dismiss under Rule 12 requires defendants to
produce affidavits, discovery materials, or other
admissible evidence establishing the lack of proper
service.  <u>See</u> <u>Ermine Tech. Co., Ltd. v. Aten Intern. Co.,
Ltd.</u>, No. C 08-3122 PJH, 2008 WL 5000526, *2 (N.D. Cal.
Nov. 21, 2008) (citing <u>Federal Civil Procedure Before
Trial</u> § 9:149).

---

[5] Defendants requested an evidentiary hearing to
resolve this factual dispute.  (Reply for Mot. re:
Insufficient Service at 4.)  The Court denied the
request.  (<u>See</u> Doc. No. 30.)

The Ninth Circuit has described Rule 4 as "a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc., 840 F.2d 685, 688 (9th Cir. 1988) (discussing requirements for perfecting service against a corporation).  Without substantial compliance with Rule 4, however, "neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction."  Id. (quoting Benny, 799 F.2d at 492).

Defendants base their argument that ESIS did not receive a summons on CT process specialists' general practice of requesting process servers "to identify which entity is being served" when there are multiple entries on a document.  (Wilson Decl. ¶ 6.)  Although she does not recall the service in this action, the process specialist who accepted service of Plaintiff's FAC states that she typically requests and records this designation. (Id. ¶ 7.)  CT's records from that date indicate that only ACE was served with the summons and FAC on March 4, 2011.  (Mot. re: Insufficient Service, N. Flores Decl., Ex. D.)

CT is the agent for service of process for both ACE and ESIS.  (Mot. re: Insufficient Service at 5.)  CT received both the summons and FAC for this action on

March 4, 2011.  (<u>Id.</u>, N. Flores Decl., Ex. D.)
Plaintiff's process server has filed two valid proofs of
service with the Court.  (Doc. Nos. 9, 10.)  None of CT's
employees recall the service of process on either ACE or
ESIS, but one of CT's managers has stated that she
believes, based on CT's records, that ESIS was not
properly served.  (See Mot. re: Insufficient Service,
Flores Decl. ¶ f.)  The Court finds the declarations from
CT's employees who do not recall any service on ESIS do
not constitute the "strong and convincing evidence"
necessary to establish lack of proper service.
Accordingly, the service of process upon CT was
sufficient in this case to create personal jurisdiction
over both ESIS and ACE.  <u>See</u> <u>Direct Mail</u>, 840 F.2d at
688-89 (upholding jurisdiction where service was made
upon secretary in shared office of defendant and another
corporation, and where defendant received actual notice
of the service).

    Defendants next argue that the claims against ACE
should be dismissed because the summons served on ACE
named the original Complaint rather than the FAC, and
thus did not "substantially comply" with Rule 4.  (Mot.
re: Insufficient Service at 9-10.)  Defendants' argument
lacks merit.  The Ninth Circuit has established that when
a defendant has presented no evidence that it was
prejudiced by a technical deficiency in the summons,

dismissal is not justified.  <u>United Food & Commercial</u>
<u>Workers Union v. Alpha Beta Co.</u>, 736 F.2d 1371, 1382 (9th
Cir. 1984) (holding that technical defects in the
summons, including failure to name all of the defendants
and specifying the incorrect time for filing the answer,
did not justify dismissal) (citations omitted).  As
Defendants have not demonstrated that the deficiency in
the summons caused any actual prejudice to them,
dismissal is not warranted here.

    Accordingly, the Court DENIES Defendants' Motion to
Dismiss for Insufficient Service and Insufficient Service
of Process.

**B.    Failure to Arbitrate**

    In their second motion, Defendants argue the action
should be dismissed or, alternatively, stayed because the
Program Agreements' terms require that the dispute be
arbitrated.  (Mot. re: Failure to Arbitrate at 1-2.)
Defendants assert that on March 21, 2011, they served
Plaintiff with a Demand for Arbitration pursuant to the
terms of the arbitration clause in the Program
Agreements.  (<u>Id.</u> at 9; <u>id.</u>, Gordon Decl. ¶ 10, Ex. H.)
Plaintiff objects to dismissal or a stay, arguing that
the matter is not suitable for arbitration because its
claims arise only from the Policies, and not the Program

Agreements.  (Opp'n to Mot. re: Failure to Arbitrate at 1-2, 12.)

The Program Agreements are part of a series of contracts between Plaintiff, a California corporation, and Defendants, two Pennsylvania corporations, regarding payment for insurance coverage wherever Plaintiff does business nationally; thus, the insurance program is a transaction involving interstate commerce within the meaning of the FAA.  9 U.S.C. § 1.  Accordingly, the FAA applies to the Program Agreements, and the question of whether or not this dispute is arbitrable is governed by the FAA, not by state law.  See Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1062 (9th Cir. 1991) ("The Supreme Court has said time and again that issues of arbitrability in cases subject to the [FAA] are governed by federal law.").

As stated earlier, the court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  Chiron, 207 F.3d at 1130.  The "arbitrability of a particular dispute is a threshold issue to be decided by the courts." Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1268 (9th Cir. 2006) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)).

1. **The Program Agreements Contain a Valid**
**Arbitration Agreement**

The FAA states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A challenge to an arbitration provision, and not the contract as a whole, is reviewable in the first instance by a court rather than an arbitrator. <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 443 (2006). Here, Plaintiff claims that the arbitration provisions in the Program Agreements are procedurally and substantively unconscionable, and thus are unenforceable. (Opp'n to Mot. re: Failure to Arbitrate at 2.)

As an initial matter, the Court must address the dispute between the parties as to what law applies here to determine unconscionability; Plaintiff assumes California law applies, whereas Defendants argue Pennsylvania law applies. The Program Agreements contain a clause that they "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." (Mot. re: Failure to Arbitrate, Gordon Decl., Ex. A at 8.)

## I. Choice of Law

California choice of law analysis governs the enforcement of the choice of law provision.  <u>See</u> <u>Orr v. Bank of Am.</u>, 285 F.3d 764, 772 n.4 (9th Cir. 2002) (federal court sitting in diversity applies the forum state's choice of law rules).  California uses the test set forth in <u>Nedlloyd Lines B.V. v. Superior Court</u> to determine whether to enforce a choice of law provision. 3 Cal. 4th 459 (1992).  This test draws heavily on section 187 of the Restatement Second of Conflict of Laws ("Restatement").  <u>Id.</u> at 464-66.

Under <u>Nedlloyd</u>, California will apply the law indicated by the choice of law provision where:  "(1) the chosen state has a substantial relationship to the parties or their transaction," or where "(2) there is any other reasonable basis for the parties' choice of law." <u>Id.</u> at 466.  "If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law."  <u>Id.</u>

Where either test is met, the court proceeds to the second step and "determine[s] whether the chosen state's law is contrary to a fundamental policy of California." <u>Nedlloyd</u>, 3 Cal. 4th at 466.  Where "there is a fundamental conflict with California law," the court proceeds to the third step and determines whether

California has a "materially greater interest" than the chosen state in the determination of the particular issue.  <u>Id.</u>  "If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy."  <u>Id.</u> (internal citations and quotations omitted).

### a.  Substantial Relationship

Applying the <u>Nedlloyd</u> test here, the court must first determine "whether the chosen state has a substantial relationship to the parties or their transaction . . . ." <u>Nedlloyd</u>, 3 Cal. 4th at 466.  This requirement is satisfied here, as both Defendants are incorporated in Pennsylvania.  <u>See</u> <u>id.</u> at 467.

### b.  Fundamental Policy

As a substantial relationship exists, the court next "determine[s] whether the chosen state's law is contrary to a fundamental policy of California" or that of a third state.  <u>Nedlloyd</u>, 3 Cal. 4th at 466, 467 n.5.  Where enforcement of the choice of law provision would run counter to a fundamental policy of California or a third state, then the court must refuse to enforce the choice of law provision if it finds that "California has a 'materially greater interest than the chosen state in the

determination of a particular issue . . . .'" <u>Id.</u> at 466.

There is no bright-line definition of a "fundamental policy." Restatement § 187 comment g. A fundamental policy must be "substantive," and "may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." <u>Id.</u> Plaintiff assumes the application of California law, and thus does not argue which law should apply here. The principles of unconscionability in California as argued by Plaintiff do not demonstrate any fundamental policy regarding insurance disputes or arbitration that would be upset by the application of Pennsylvania law. As a result, there is no showing here that California's public policy would be frustrated by applying Pennsylvania law in this case. <u>Nedlloyd</u>, 3 Cal. 4th at 468.

Accordingly, as Plaintiff has not shown California's fundamental interest would be frustrated by applying Pennsylvania law to determine unconscionability here, the Court does not reach the last step of the analysis, which would otherwise require examination of whether or not California had a materially greater interest than Pennsylvania in applying its own law to this case.

<u>Nedlloyd</u>, 3 Cal. 4th at 466.  Pennsylvania law applies here.

### 2.  Unconscionability

Plaintiff argues the arbitration provisions in Defendants' contracts are unconscionable.  (Opp'n to Mot. re: Failure to Arbitrate at 16-18.)  It argues the provisions are procedurally unconscionable because ACE offered the contract to plaintiff on a "take it or leave it" basis and also because ACE never provided Plaintiff with a copy of the Rules of the American Arbitration Association.  (<u>Id.</u> at 16-17.)  It argues the provisions are substantively unconscionable because it did not expect insurance disputes would be subject to the arbitration provision and because there is no express advertisement in the Program Agreements putting Plaintiff on notice that such disputes would be subject to arbitration.  (<u>Id.</u> at 17-18.)

Under Pennsylvania law, "a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it."  <u>Salley v. Option One Mortgage Corp.</u>, 925 A.2d 115, 119 (Pa. 2007).  As in California, Pennsylvania law looks to both the procedure of contract formation and the substance of the contract

when determining unconscionability.  <u>See</u> <u>Zimmer v.</u>
<u>CooperNeff Advisors, Inc.</u>, 523 F.3d 224 (3d Cir. 2008)
(finding arbitration clause between employee and employer
unconscionable).

     "Procedural unconscionability refers specifically to
'the process by which an agreement is reached and the
form of an agreement, including the use therein of fine
print and convoluted or unclear language.'" <u>Zimmer</u>, 523
F.3d at 228 (citing <u>Harris v. Green Tree Financial Corp.</u>,
183 F.3d 173, 181 (3d Cir. 1999)).  "Substantive
unconscionability looks to whether the arbitration
provision 'unreasonably favors the party asserting it.'"
<u>Zimmer</u>, 523 F.3d at 228 (citing <u>Salley</u>, 925 A.2d at 119).

     Courts applying Pennsylvania law look to the relative
positions of the contracting parties when determining
procedural unconscionability.  For example, a situation
where "minimally educated crane operators" were presented
with an employment contract on a take-it-or-leave-it
basis was considered unconscionable, although an
employment contract between a highly-educated economist
with multiple job offers was not.  <u>Zimmer</u>, 523 F.3d at
229-30 (comparing <u>Alexander v. Anthony, Int'l, L.P.</u>, 341
F.3d 256, 258-60, 266-68 (3d Cir. 2003)).  As Defendants
argue, the Policies and the Program Agreements were
agreed to by AMPAM as a large corporation in the process

24

of restructuring post-bankruptcy.  Defendants assert, and
Plaintiff does not deny, that AMPAM chose ACE over a
number of other options.  This situation is far removed
from that of a single employee contracting with a large
corporation, and the existence of a non-negotiable
contract is not enough to render the provisions
unconscionable.  In these circumstances, the Court finds
that AMPAM "did not lack a meaningful choice in accepting
the challenged arbitration provision."  <u>Zimmer</u>, 523 F.3d
at 229.

Plaintiff's only arguments regarding substantive
unconscionability revolve around its objection to
arbitrating insurance coverage disputes.  As will be
discussed further below, only Plaintiff's claims
regarding the collateral obligation from the Program
Agreements clearly fall under the arbitration provisions
of the Program Agreements.  Plaintiff cites no legal
authority for its assertion that the Program Agreements
needed any "express advertisement" that claims arising
out of them would be arbitrated, apart from the
provisions themselves, which were clearly stated in the
fifteen-page document.  (<u>See</u> Mot. re: Failure to
Arbitrate, Gordon Decl., Ex. A.)  Additionally, Plaintiff
has not demonstrated that the arbitration provisions
"unreasonably favor" ACE in its terms or conditions.
<u>See</u> <u>Zimmer</u>, 523 F.3d at 228.

The burden of proving unconscionability lies with the party challenging the contract provision.  <u>Harris</u>, 183 F.3d at 181.  Here, Plaintiff has not demonstrated that the arbitration provisions in the Program Agreements are unconscionable.

### 2.    Plaintiff's Claims Fall Under the Arbitration Provision in the Program Agreements

Plaintiff makes the following claims against Defendants in the FAC: (1) Defendants violated the terms of the Bankruptcy Order and Enforcement Order; (2) ACE demanded Plaintiff commit to an unreasonable collateral obligation which allowed Defendants to secure Plaintiff's payment on deductibles; (3) Defendants failed to minimize Plaintiff's losses where possible by seeking contribution from additional carriers; and (4) ACE imposed a deductible on Plaintiff in declaratory relief actions where the deductible provision was not triggered.

As courts repeatedly have stated, "[t]he legislative history of the [FAA] establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate."  <u>Dean Witter</u>, 470 U.S. at 219.  The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"  <u>Moses H. Cone</u>, 460 U.S. at 24-25; <u>see</u>

also <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. __, 2011 WL 1561956, at *9 (2011) ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration.").

The terms of the collateral obligation are contained in the Program Agreements. (<u>See</u> Mot. re: Failure to Arbitrate, Gordon Decl., Ex. A at 1, 5-7.) Plaintiff expressly challenges the terms of the collateral obligation and its effects. (FAC ¶¶ 36-43.) Accordingly, Plaintiff has brought claims under the Program Agreements. Under the terms of the Program Agreements, Plaintiff and ACE agreed to arbitrate any disputes "arising out of or relating to" the Program Agreements. The Ninth Circuit has recognized that when parties use such language in an arbitration clause, they "intend[] to reach all aspects of their relationship." <u>Schoenduve Corp. v. Lucent Tech., Inc.</u>, 442 F.3d 727, 732 (9th Cir. 2006) (finding that arbitration clause with "relating to or arising out of" language is broad enough to cover extra-contractual claims). Accordingly, the arbitration provision in the Program Agreements applies to at least some of Plaintiff's claims.

Plaintiff also argues that it would be unfair to split the claims against it and allow some claims to be arbitrated while others are stayed for ultimate

resolution in this Court.  (Opp'n to Mot. re: Failure to Arbitrate at 14-16).  This argument clearly is contradicted by established law.  <u>See, e.g.</u>, <u>Dean Witter</u>, 470 U.S. at 217 ("[T]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims . . . even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.").  The FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement." <u>Tracer Research Corp. v. Nat'l Envtl. Servs. Co.</u>, 42 F.3d 1292, 1294 (9th Cir. 1994) (citing <u>Moses H. Cone</u>, 460 U.S. at 20).  Accordingly, a stay pending arbitration of the arbitrable claims is appropriate here.[6]

Plaintiff also cites to an unpublished Ninth Circuit opinion arising out of this district[7] for the proposition that an arbitration agreement in a program agreement does not compel arbitration of claims arising out of a related insurance program.  (Opp'n to Mot. re: Failure to

_____

[6] As this Court is a federal court exercising its diversity jurisdiction, it does not address Plaintiff's argument brought under the California Code of Civil Procedure regarding the primary right theory.  <u>See, e.g.</u>, <u>Zamani v. Carnes</u>, 491 F.3d 990 (9th Cir. 2007) ("Federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law.") (internal citations omitted).

[7] <u>UMG Recordings, Inc., et al. v. Am. Home Assurance Co., et al.</u>, 378 Fed. Appx. 766 (9th Cir. 2010).  The Court agrees with Defendants that, under Ninth Circuit Rule 36-3, this case is not precedential.

Arbitrate at 1, 13.)   In UMG Recordings, the dispute
concerned only the insurer's alleged failure to defend
and indemnify the insured in an underlying lawsuit, and
thus was purely an issue of coverage under the policy.
See UMG Recordings, Inc. et al. v. Am. Home Assurance
Company et al., No. CV 07-3257 GAF (AGRx) (C.D. Cal. Nov.
3, 2008) (order denying summary judgment motion).   Here,
Plaintiff brings a number of claims, including a breach
of contract claim that calls into question the validity
of the collateral agreement set forth in the Program
Agreements.

    The appropriate course of action at this time is a
stay of all of Plaintiff's claims against Defendants
pending arbitration of some or all of Plaintiff's claims
in Philadelphia.   9 U.S.C. § 3.   Dismissal is not
necessary here, where there are claims that may not be
addressed in an arbitration under the Program Agreements
and thus would remain before this Court.   Cf. Sparling v.
Hoffman Const. Co., Inc., 864 F.2d 635 (9th Cir. 1988)
(holding dismissal was appropriate where "arbitration
clause was broad enough to bar all of the plaintiff's
claims").   As this matter is not before the Court on a
motion to compel arbitration, the Court does not make a
determination of which of Plaintiff's claims should be
arbitrated or whether ESIS may choose to participate in
the arbitration between Plaintiff and ACE.

# IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dismiss for Insufficient Service and GRANTS Defendants' Motion to Stay for Failure to Arbitrate.

The Court STAYS the entire action pending the resolution of the arbitration proceeding currently noticed in Philadelphia, Pennsylvania. Plaintiff and Defendants are to file a joint status report with the Court no less than ninety days after the date of this judgment, or ten days after the completion of the arbitration. If the arbitration has not been completed within the first ninety days, the parties are to file a joint status report with the Court every thirty days thereafter until the arbitration has concluded.

Dated: __June 3, 2011__

_____
VIRGINIA A. PHILLIPS
United States District Judge